IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-01956-PAB-MJW

LEO LECH,
ALFONSIA LECH, and
JOHN LECH,

      Plaintiffs,

v.

CHIEF JOHN A. JACKSON,
COMMANDER DUSTIN VARNEY,
OFFICER MIC SMITH,
OFFICER JEFF MULQUEEN,
OFFICER AUSTIN SPEER,
OFFICER JARED ARTHUR,
OFFICER BRYAN STUEBINGER,
OFFICER JUAN VILLALVA,
OFFICER ANDY WYNDER,
OFFICER ANTHONY COSTARELLA,
OFFICER ROB HASCHE,
of the Greenwood Village Police Department, individually and in their official capacities,
and
THE CITY OF GREENWOOD VILLAGE,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on Defendants' Motion and Brief in Support of

Summary Judgment [Docket No. 47] and Plaintiffs' Motion for Partial Summary

Judgment on the Takings Clause and Due Process Issues [Docket No. 48]. This Court

has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## I. BACKGROUND

The following facts are undisputed unless noted otherwise.  In 2013, plaintiffs Leo and Alfonsina Lech purchased the property at 4219 South Alton Street in Greenwood Village, Colorado, both as an investment and as a place for their son, plaintiff John Lech, to live.  Docket No. 47 at 2, ¶ 1; Docket No. 54 at 1, ¶ 1.  The home was a bi-level home that backed directly to Interstate 225.  Docket No. 47 at 2, ¶¶ 2-3. At the time of the events giving rise to this lawsuit, John Lech lived at the property with his girlfriend, Anna Mumzhiyan, and her son.  *Id.*, ¶ 4.

The events at issue in this case occurred on June 3-4, 2015.  Docket No. 47 at 1; Docket No. 48 at 1.  In the afternoon of June 3, 2015, an officer with the Aurora Police Department was dispatched to a local Walmart to assist in a shoplifting investigation.  Docket No. 47 at 5-6, ¶ 17.[1]  However, after the officer confronted the shoplifting suspect and attempted to escort him back to the store's loss prevention office, the suspect fled the scene in a vehicle at high speed.  *Id.*; Docket No. 47-9 at 2.[2] The officer found the vehicle abandoned, Docket No. 47 at 6, ¶ 18, and later observed the suspect cross the northbound lanes of Interstate 225 on foot.  *Id.*  A civilian informed the officer that she saw the suspect with a black semi-automatic pistol.  *Id.*

The Greenwood Village Police Department ("GVPD") was notified through dispatch that the Aurora Police Department was pursuing an armed suspect – later

---

[1]Aurora is a municipality located near Greenwood Village.

[2]Defendants state that, in fleeing the scene, the suspect attempted to run the officer over with his vehicle.  Docket No. 47 at 5-6, ¶ 17.  Plaintiffs assert that this is a legal conclusion that has yet to be proven in court.  Docket No. 54 at 2, ¶ 17.

identified as Robert Jonathan Seacat – on foot near the northern border of Greenwood Village.  *Id.*, ¶ 19.  At approximately 1:54 p.m., GVPD responded to a burglar alarm at plaintiffs' residence.  *Id.*, ¶ 20.  GVPD learned that a nine-year-old boy – Anna Mumzhiyan's son, D.Z. – was present in the home when Seacat entered, though he was able to leave the residence unharmed.  *Id.*; Docket No. 4 at 3, ¶ 10.  Officers positioned their vehicles in the driveway to block any attempt by Seacat to drive a vehicle out of the garage.  Docket No. 47 at 6-7, ¶ 21.  As one officer was getting out of his car, a bullet fired from inside the garage went through the garage door and struck the police car's hood.  *Id.*[3]

From the outset, GVPD deemed the incident a "high-risk, barricade suspect situation."  Docket No. 47 at 7, ¶ 22.  Under the GVPD manual, a "barricade situation" is defined as a "standoff created by an armed or potentially armed suspect in any location . . . who is refusing to comply with police demands for surrender."  *Id.* at 4, ¶ 11.  The manual defines a high-risk situation as "[t]he arrest or apprehension of an armed or potentially armed subject where the likelihood of armed resistence is high."  *Id.*

Shortly after shots were fired through the garage door, Commander Dustin Varney of the GVPD arrived on scene and assumed the role of incident commander.  *Id.* at 7, ¶ 23.  As incident commander, Commander Varney was directly in charge of deploying resources and managing events during the incident.  *Id.*  Commander Varney secured the scene, set up tactical command posts, and activated GVPD's Emergency

---

[3]Although plaintiffs do not deny that a bullet struck the car's hood, they contend that defendants' statement that Mr. Seacat "fired at the officers" constitutes speculation about Mr. Seacat's state of mind.  Docket No. 54 at 3, ¶ 21.

Response and Crisis Negotiation Teams.  *Id.*, ¶ 24.  He also shut off the gas and water to the home, restricted overhead airspace, and sent a reverse 911 call out to residents in the neighborhood informing them of safety protocols.  *Id.*

For approximately four and a half hours, GVPD negotiators tried to get Seacat to surrender.  *Id.* at 8, ¶ 30; Docket No. 54 at 4, ¶ 31; Docket No. 47-10 at 1.  GVPD negotiated with Seacat via his cellphone and, at Seacat's request, brought Seacat's sister to the scene.  Docket No. 47 at 8, ¶¶ 29-30.  GVPD also played messages from Seacat's family members over a loudspeaker.  *Id.*  Despite these efforts, Seacat did not surrender.  *Id.*

At approximately 7:11 p.m., when there had been no sightings of Seacat for several hours, Commander Varney authorized the firing of two 40 mm rounds of cold gas munitions through a window for the purpose of getting Seacat out of the residence.  *Id.*, ¶ 31.  This tactic did not elicit a response.  *Id.*

About the same time, Commander Varney authorized officers to shut off Seacat's cell phone and to deliver a "throw" phone and a robot into the home.  *Id.*, ¶ 32; Docket No. 47-10 at 1-2.  GVPD believed at this point that Seacat was barricaded on the top floor of the residence.  Docket No. 47 at 9, ¶ 33.  To enable delivery of a robot and the throw phone, officers breached the front and rear doors of the residence using a BearCat armored vehicle.  *Id.* at 9, ¶¶ 34-35; Docket No. 47-10 at 2.  Over three hours later, at approximately 10:40 p.m., a tactical team for GVPD entered the residence to apprehend Seacat.  Docket No. 47 at 9-10, ¶ 36.  As the officers

4

attempted to reach the second floor, Seacat fired at them several times. *Id.*[4]  The

officers were ordered to leave the home. *Id.*

Commander Varney authorized the deployment of additional gas munitions at

various times throughout the incident in an attempt to get Seacat out of the home. *Id.*,

¶ 37.  These efforts were unsuccessful. *Id.*

In the early morning hours of June 4, 2015, a throw phone was delivered to the

second floor of the home where officers believed Seacat was hiding. *Id.*, ¶ 38.  Despite

calls to the phone and officers' announcements via loudspeaker, Seacat did not pick up

the phone. *Id.*  Seacat's personal cell phone was turned back on at approximately 4:05

a.m., but negotiators were also unable to reach Seacat on his cell phone. *Id.*

At approximately 5:14 a.m., Commander Varney authorized the use of another

EOD charge on the east side of the home for the purpose of locating Seacat and

limiting his movements inside the home. *Id.*, ¶ 39.  Officers also continued their

negotiation efforts and deployed additional gas munitions in an effort to induce Seacat

to exit the residence. *Id.* at 11, ¶ 40.  These efforts failed. *Id.*

Due to law enforcement's inability to communicate with Seacat or force him out

of the residence with the gas munitions, Commander Varney authorized the use of the

BearCat to open up holes in the back of the home. *Id.*, ¶ 41.  Commander Varney

instructed the officers to "take as much of the building as needed without making the

roof fall in."  Docket No. 47-4 at 20, 50:12-21; Docket No. 47-16 at 6; Docket No. 54-3

---

[4]Plaintiffs object to this statement to the extent it attributes a particular state of mind or intent to Seacat.  Docket No. 54 at 4, ¶ 36.  However, there appears to be no dispute that Seacat discharged his weapon in the direction of the police officers and in response to their presence.

at 2, 103:4-13 (Varney deposition).  Chief John Jackson, the Chief of Police for GVPD at the time of the incident, testified that he and Commander Varney discussed this instruction and, specifically, the need to use destructive tactics "for a purpose rather than simply taking apart the house."  *Id.* at 20-21, 50:25-51:10; Docket No. 53 at 6, ¶ 2 (admitting that Chief Jackson was the Chief of Police at the time of the incident).  It is undisputed that the purpose of opening up holes in the side of the home was threefold: (1) to create sightlines into the home for the purpose of enabling officers to locate Seacat; (2) to make Seacat feel more exposed; and (3) to create gun ports so snipers could shoot into the residence from a distance.  Docket No. 47 at 11, ¶¶ 41-42. [5]

After officers had punctured holes in the side of the home, Commander Varney sent a tactical team into the residence.  *Id.*, ¶ 43.  The tactical team succeeded in disarming Seacat and taking him into custody, thereby ending the incident after approximately nineteen hours.  *Id.*

As a result of the police actions used during the standoff, plaintiffs' home was rendered uninhabitable.  Docket No. 48 at 3, ¶ 11.  Plaintiffs ultimately demolished the home and built a new one in its place.  Docket No. 47 at 14, ¶¶ 60-61.  Greenwood Village offered plaintiffs $5,000 to help with temporary living expenses, but it denied any liability for the incident and declined to provide further compensation.  Docket No. 48 at 3, ¶ 13; Docket No. 53 at 7, ¶ 10.

---

[5]In their motion to strike, plaintiffs object to defendants' assertion that the BearCat was used to "negate [Seacat's] ability to ambush officers" on the ground that it is not supported by the record.  *See* Docket No. 80 at 10.  The Court need not decide this issue, however, because it is immaterial to the Court's resolution of the parties' summary judgment motions.

Plaintiffs filed this lawsuit in the District Court for Arapahoe County, Colorado on June 3, 2016. Docket No. 1-3 at 1. Plaintiffs' complaint asserts the following claims against Greenwood Village and members of the Greenwood Village Police Department in their individual and official capacities: (1) taking without just compensation in violation of the U.S. and Colorado constitutions; (2) denial of plaintiffs' due process rights under the U.S. and Colorado constitutions: (3) trespass; (4) negligence; (5) negligent infliction of emotional distress; and (6) intentional infliction of emotional distress. *See* Docket No. 4. Defendants removed the case to federal court on August 1, 2016. Docket No. 1. On July 10, 2017, defendants moved for summary judgment on all claims, Docket No. 47, and plaintiffs moved for partial summary judgment on their takings and due process claims. Docket No. 48.

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotation marks omitted) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*

## III.  ANALYSIS

Defendants move for summary judgment on all claims. Plaintiffs move for summary judgment on their takings and due process claims.

8

**A.  Ripeness of Federal Takings and Due Process Claims**

Defendants argue that plaintiffs' claims under the Takings and Due Process

Clauses of the Fifth and Fourteenth Amendments are not ripe for review because

plaintiffs have failed to exhaust state procedures for obtaining just compensation.

Docket No. 47 at 16-18.

Under *Williamson County Regional Planning Commission v. Hamilton Bank of

Johnson City*, 473 U.S. 172 (1985), if a state provides adequate procedures for

obtaining just compensation, a property owner must utilize those procedures before

bringing a claim under the Takings Clause of the Fifth Amendment.  *Id.* at 194-95.[6]  As

the Tenth Circuit has recognized, "the State of Colorado has provided a procedure for

_____

[6]Plaintiffs argue that *Williamson County* is inapposite because it involved a regulatory taking.  *See* Docket No. 54 at 8.  In contrast to an "actual" taking, or a "direct government appropriation or physical invasion of private property," a regulatory taking occurs when "government regulation of private property . . . [is] so onerous that its effect is tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Although this is an important distinction, the Supreme Court's determination that a plaintiff must exhaust state compensation procedures before bringing a federal takings claim is predicated on the language of the Takings Clause itself, which encompasses both physical and regulatory takings.  *See Williamson Cty.*, 473 U.S. at 194 (noting that "[t]he Fifth Amendment does not proscribe the taking of property," but only "taking without just compensation"); *Lingle*, 544 U.S. at 537 (explaining that both physical and regulatory takings are compensable under the Fifth Amendment).  To the extent plaintiffs assert that the Supreme Court's ripeness holding was based on the developer's failure in *Williamson County* to obtain a final decision regarding the effect of a zoning ordinance, the Court notes that *Williamson County* set forth two separate ripeness requirements: (1) "that the government entity charged with implementing the [challenged] regulations has reached a final decision regarding the application of the regulations to the property at issue"; and (2) that the plaintiff has "sought just compensation through the available state procedures and been denied relief."  *Schanzenbach v. Town of LaBarge*, 706 F.3d 1277, 1281-82 (10th Cir. 2013); *see also Williamson Cty.*, 473 U.S. at 186-95.  Although both requirements served as the basis for the Supreme Court's holding in *Williamson County*, only the second is at issue in this case.

obtaining compensation for inverse condemnation." *SK Finance SA v. La Plata Cty., Bd. of Cty. Comm'rs*, 126 F.3d 1272, 1276 (10th Cir. 1997) (citing Colo. Rev. Stat. § 38-1-101 *et seq.*).[7]   The failure to utilize that procedure thus renders a federal takings claim unripe for review.   *See id.* (federal takings claim unripe because plaintiff had not availed itself of Colorado's statutory procedure for obtaining just compensation).

The requirement that a property owner exhaust state compensation procedures before seeking redress under federal law has also been applied to due process claims that assert "the same loss upon which the . . . takings claim is based." *Rocky Mountain Materials & Asphalt, Inc. v. Bd. of Cty. Comm'rs of El Paso Cty.*, 972 F.2d 309, 311 (10th Cir. 1992).   In such circumstances, courts in this circuit have "required the plaintiff to utilize the remedies applicable to the takings claim." *Id.*; *see also Miller v. Campbell Cty.*, 945 F.2d 348, 352 (10th Cir. 1991) (explaining that, when "factual situation [ ] falls squarely within" Takings Clause, "[i]t is appropriate . . . to subsume the more generalized Fourteenth Amendment due process protections within the more particularized protections of the Just Compensation Clause").   Accordingly, the failure to bring an inverse condemnation action in state court renders the due process claim "likewise not ripe because it is in essence based on the same deprivation." *Rocky Mountain Materials & Asphalt, Inc.*, 972 F.2d at 311.

---

[7]Colo. Rev. Stat. § 38-1-101 prohibits takings without just compensation and provides that, "[i]n all cases in which compensation is not made by the state in its corporate capacity, such compensation shall be ascertained by a board of commissioners of not less than three disinterested and impartial freeholders . . . or by a jury when required by the owner of the property . . . ."

Since its decision in *Williamson County*, however, the Supreme Court has clarified that the state compensation requirement is based on prudential rather than jurisdictional concerns.  *See Horne v. Dep't of Agric.*, 569 U.S. 513, 525-26 (2013). Moreover, *Williamson County* "does not preclude state courts from hearing simultaneously a plaintiff's request for compensation under state law and the claim that, in the alternative, the denial of compensation would violate the Fifth Amendment of the Federal Constitution."  *San Remo Hotel, L.P. v. City & Cty. of San Francisco*, 545 U.S. 323, 346 (2005).  Relying on these two propositions, courts have held that a defendant waives the *Williamson County* state compensation requirement by removing a case to federal court when the plaintiff's original state court action asserted both state and federal claims for inverse condemnation.  *See, e.g.*, *Lilly Investments v. City of Rochester*, 674 F. App'x 523, 530-31 (6th Cir. Jan. 5, 2017) (unpublished); *Sherman v. Town of Chester*, 752 F.3d 554, 563-64 (2d Cir. 2014); *Sansotta v. Town of Nags Head*, 724 F.3d 533, 544-47 (4th Cir. 2013); *Race v. Bd. of Cty. Comm'rs of the Cty. of Lake, Colo.*, No. 15-cv-1761-WJM-KLM, 2016 WL 1182791, at *3-4 (D. Colo. Mar. 28, 2016); *River N. Props., LLC v. City & Cty. of Denver*, No. 13-cv-01410-CMA-CBS, 2014 WL 1247813, at *2-9 (D. Colo. Mar. 26, 2014); *Merrill v. Summit Cty.*, 2009 WL 530569, at *3 (D. Utah Mar. 2, 2009).  As the Fourth Circuit has explained, application of the waiver doctrine in these circumstances prevents a state or political subdivision from "manipulat[ing] litigation to deny a plaintiff a forum for his claim."  *Sansotta*, 724 F.3d at 545.[8]

_____

[8]At least one court has expressed skepticism about this justification, noting that dismissal on ripeness grounds is not an adjudication on the merits and thus does not

The Court finds this reasoning persuasive.  Plaintiffs in this case did exactly what they were permitted to do by filing both their state and federal takings claims in state court.  *See San Remo Hotel*, 545 U.S. at 346.  Because state courts – like federal courts – adhere to the *Williamson County* requirement and adjudicate a plaintiff's state inverse condemnation claims before reaching the merits of any companion federal claims, dismissal of the federal claims following removal would "put[] the case in effectively the same position" as if the case had remained in state court.  *Race*, 2016 WL 1182791, at *3; *see also Claassen v. City & Cty. of Denver*, 30 P.3d 710, 715 (Colo. App. 2000) (stating that, under *Williamson County*, "the Fifth Amendment claims cannot be ripe for judicial review until the companion inverse condemnation claims are resolved").  The Court agrees that the only thing to be achieved by such a maneuver is delay.  *See id.*  Accordingly, the Court joins other courts in this district in holding that defendants waived the *Williamson County* compensation requirement by removing this case to federal court.  Plaintiffs' claims are therefore ripe for review.

## B.  State and Federal Takings Claims

Defendants argue that plaintiffs' takings claims under the U.S. and Colorado constitutions fail as a matter of law because defendants were authorized, pursuant to

---

preclude a plaintiff from bringing his federal claims at a later date.  *See Race*, 2016 WL 1182791, at *2.  Nevertheless, that court recognized that a rule waiving the *Williamson County* compensation requirement when a defendant removes a case to federal court "discourage[s] a procedural maneuver that adds nothing to the dispute but delay."  *Id.* at *3.

their police powers, to damage plaintiffs' property without triggering the requirement of just compensation.  Docket No. 47 at 23-26.[9]

The Takings Clause of the U.S. Constitution, which is applicable to the states through the Fourteenth Amendment, *see Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897), states that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  Similarly, Article II, § 15 of the Colorado Constitution provides that "[p]rivate property shall not be taken or damaged, for public or private use, without just compensation."  Colo. const. art. II, § 15.  These provisions are "designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."  *Lingle*, 544 U.S. at 537 (quoting *First English Evangelical Lutheran Church of Glendale v. Cty. of Los Angeles*, 482 U.S. 304, 314 (1987)).  At the core of the compensation requirement is the principle that government should not be permitted to "forc[e] some people alone to bear public burdens which, in all fairness and justice,

_____

[9]Defendants claim that because Article II, § 15 of the Colorado Constitution affords broader protections than the federal Takings Clause, plaintiffs' inability to survive summary judgment on the state claim requires dismissal of the federal claim. Docket No. 47 at 17.  The Court agrees that the two claims can be considered together. First, aside from the "damages" clause of Article II, §15 of the Colorado Constitution, which "only applies to situations in which the damage is caused by government activity in areas adjacent to the landowner's land," the Colorado Supreme Court has interpreted that section "as consistent with the federal [takings] clause."  *Animas Valley Sand & Gravel, Inc. v. Bd. of Cty. Comm'rs*, 38 P.3d 59, 63-64 (Colo. 2001).  Second, neither the Colorado courts applying the Colorado Constitution nor the courts in this circuit applying the federal constitution have addressed the precise issue presented in this case – whether damage to property caused by law enforcement's efforts to apprehend a suspect barricaded inside an innocent third party's home constitutes a taking without just compensation.

should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49

(1960); *Bd. of Cty. Comm'rs of Saguache Cty. v. Flickinger*, 687 P.2d 975, 983 (Colo.

1984).

However, the prohibition against uncompensated governmental interference with

private property has certain limitations.  The Takings Clause is concerned with the

government's power of eminent domain.  Where the government acquires private

property by virtue of some other authority, just compensation is not required.  *See*

*Bennis v. Michigan*, 516 U.S. 442, 452 (1996).  Consistent with this limitation, cases

applying both state and federal takings clauses have historically distinguished between

eminent domain authority, which permits the taking of private property for public use,

and the police power, which allows states to regulate private property for the protection

of public health, safety, and welfare.  *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668-

69 (1887) (distinguishing between eminent domain and police powers and stating, in

regard to the latter, that "[a] prohibition simply upon the use of property for purposes

that are declared . . . to be injurious to the health, morals, or safety of the community,

cannot, in any just sense, be deemed a taking or an appropriation of property for the

public benefit"); *City & Cty. of Denver v. Desert Truck Sales, Inc.*, 837 P.2d 759, 766-67

(Colo. 1992) (noting that "[p]olice power should not be confused with eminent domain,

in that the former controls the use of property by the owner for the public good,

authorizing its regulation and destruction without just compensation, whereas the latter

takes property for public use and compensation is given for property taken, damaged,

or destroyed").  While exercise of the eminent domain power triggers the requirement of

14

just compensation, exercise of the police power is noncompensable.  *See State Dep't of Highways, Div. of Highways v. Davis*, 626 P.2d 661, 667 (Colo. 1981) (noting that a restriction imposed under the police power is a loss without an injury).  "Like the state, municipalities have broad police powers . . . ."  *Town of Dillon v. Yacht Club Condominiums Home Owners Ass'n*, 325 P.3d 1032, 1038 (Colo. 2014).

Defendants in this case argue that they were acting pursuant to their police powers when they damaged plaintiffs' home.  Docket No. 47 at 25.  Specifically, they contend that Seacat posed a serious and ongoing threat and that the actions defendants took in apprehending him were necessary to protect the "safety, morals, health and general welfare of the public."  *Id.*  Plaintiffs respond that there is no "public safety" or emergency exception to the U.S. or Colorado constitutions.  Docket No. 48 at 7; Docket No. 54 at 6, 10.  In addition, they assert that the distinction between a taking requiring just compensation and the exercise of a state's police powers is not a matter of settled law.  Docket No. 54 at 12.

Courts in this circuit applying either Colorado law or federal law have not considered whether damage sustained to an innocent third party's home as a result of police efforts to apprehend a suspect gives rise to a compensable taking under the Colorado or U.S. constitutions.[10]  However, a majority of courts that have considered whether the just compensation requirement applies to property damage caused by police officers in the performance of their duties have concluded that it does not.  In an

---

[10]The Court notes that the parties' factual disputes, to the extent they exist, have no bearing on this question.  Plaintiffs contend that the destruction of their property constituted a taking regardless of whether defendants' actions were reasonable under the circumstances.  *See* Docket No. 48 at 5.

analogous case, the California Supreme Court held that property damage caused by law enforcement's efforts to apprehend a suspect barricaded inside a store did not give rise to an inverse condemnation action under the California Constitution. *Customer Co. v. City of Sacramento*, 895 P.2d 900, 904-05 (Cal. 1995).[11]  The court reasoned that the just compensation requirement had never "been applied to require a public entity to compensate a property owner for property damage resulting from the efforts of law enforcement officers to enforce the criminal laws." *Id.* at 906.  Instead, claims for property damage caused by public employees in the performance of their duties had generally been understood as arising in tort. *Id.* at 909.

The California Supreme Court also relied on the so-called "emergency exception" – "a specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause" – to support its conclusion that the property damage alleged in the case was noncompensable under California's takings clause. *Id.* at 909.  The emergency exception has historically been applied to deny compensation where property is destroyed to avert a public emergency, such as a fire, *see, e.g.*, *Bowditch v. City of Boston*, 101 U.S. 16, 18 (1879), or the advance of enemy troops, *see, e.g.*, *United States v. Caltex, Inc.*, 344 U.S. 149 (1952).  The court concluded that the case fell within the scope of this exception, given that "law enforcement officers must be permitted to respond to emergency situations that

_____

[11]Article I, Section 19(a) of the California Constitution provides that "[p]rivate property may be taken or damaged for a public use and only when just compensation . . . has first been paid to . . . the owner."

endanger public safety, unhampered by the specter of constitutionally mandated liability for resulting damage to private property." *Customer Co.*, 895 P.2d at 910-11.

Cases decided before and after *Customer Co.* have similarly concluded that property damage caused by law enforcement officials in the performance of their duties does not give rise to a claim for just compensation. *See, e.g.*, *Johnson v. Manitowoc Cty.*, 635 F.3d 331, 336 (7th Cir. 2011) (holding that property damage resulting from officers' execution of search warrant did not give rise to claim for just compensation because officers were acting pursuant to police powers); *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1153 (Fed. Cir. 2008) (holding that seizure and retention of innocent third party's property for use in criminal prosecution did not give rise to claim for just compensation, even where government action rendered property useless, because "[p]roperty seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause"); *Jones v. Phila. Police Dep't*, 57 F. App'x 939, 941-43 (3d Cir. 2003) (unpublished) (holding, under multi-factor balancing test, that property damage resulting from police officers' execution of search warrant did not entitle property owner to compensation under the Fifth Amendment); *Lawmaster v. Ward*, 125 F.3d 1341, 1351 (10th Cir. 1997) (holding that plaintiff failed to allege any facts showing how property was taken for public use under the Fifth Amendment where property was damaged during officers' execution of search warrant); *Eggleston v. Pierce Cty.*, 64 P.3d 618, 623, 627 (Wash. 2003) (distinguishing between police power and power of eminent domain and holding that plaintiff was not entitled to just compensation after police rendered home uninhabitable by removing load-bearing wall

17

for use as evidence during execution of search warrant); *Kelley v. Story Cty. Sheriff,* 611 N.W.2d 475, 482 (Iowa 2000) (concluding that property damage caused by officers during execution of search warrant "was a reasonable exercise of police power and therefore does not amount to a taking of plaintiff's property within the meaning" of the Iowa constitution); *McCoy v. Sanders*, 148 S.E.2d 902 (Ga. App. 1966) (holding that property owner was not entitled to just compensation because officers were acting pursuant to state's police powers when they drained fish pond in order to locate body of murder victim).

At least two courts have reached the opposite conclusion.  In *Steele v. City of Houston*, 603 S.W.2d 786 (Tex. 1980), the Texas Supreme Court held that police officers' destruction of the plaintiffs' home in attempting to apprehend three escaped convicts supported a cause of action under the takings clause of the Texas Constitution.  *Id.* at 791.  The court declined to "differentiate between an exercise of police power . . . and eminent domain," finding the distinction unhelpful "in determining when private citizens affected by governmental actions must be compensated."  *Id.* at 789.  However, the court noted that the defendant would be permitted on remand to "defend its actions by proof of a great public necessity."  *Id.* at 792.

Similarly, in *Wegner v. Milwaukee Mutual Insurance Co.*, 479 N.W.2d 38 (Minn. 1991), the Minnesota Supreme Court held that "where an innocent third party's property is damaged by the police in the course of apprehending a suspect, that property is damaged within the meaning of the [Minnesota] constitution."  *Id.* at 41-42.  Similar to this case and *Steele*, *Wegner* involved the destruction of an innocent third party's home

by police officers in their attempt to apprehend a suspect who had taken refuge inside. *Id.* at 39.  In holding that the city was required to provide compensation under the state takings clause, the court rejected the dichotomy between a state's police power and its power of eminent domain, emphasizing that it would be unjust for an innocent homeowner to bear the entire loss caused by government action benefitting the public as a whole.  *Id.* at 40, 42.  Relying on this principle, the court went further than *Steele* and held that the city could not avoid liability based on the doctrine of public necessity. *Id.* at 42.

Plaintiffs urge this Court to dispense with the distinction between police powers and eminent domain and adopt the reasoning of *Steele* and *Wegner*.  *See* Docket No. 48 at 7-8; Docket No. 54 at 12.  Plaintiffs suggest that the holdings in those cases better comport with the principle that property owners should not be forced "to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  Docket No. 54 at 12.  Although the Court is sympathetic to plaintiffs' loss, it finds these arguments unpersuasive.

As an initial matter, the Court agrees that "simply labeling the actions of the police as an exercise of the police power cannot justify the disregard of the constitutional inhibitions."  Docket No. 48 at 8 (quoting *Wegner*, 479 N.W.2d at 40).  But while a state's police powers are "not without limit[,] . . . . [t]he limits . . . are largely imposed by the Due Process Clause."  *AmeriSource Corp.,* 525 F.3d at 1154; *Town of Dillon*, 325 P.3d at 1039 ("Though broad, a municipality's police powers are limited by due process.").  The holdings in both *Steele* and *Wegner* were based in part on a

19

determination that the distinction between the police power and the power of eminent domain is no longer helpful in determining whether an individual is entitled to just compensation.  *See Wegner*, 479 N.W.2d at 40; *Steele*, 603 S.W.2d at 789.  The Court agrees that this line is poorly defined.  *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982) (accepting court of appeals' determination that law fell within state's police power but stating that "[i]t is a separate question . . . whether an otherwise valid regulation so frustrates property rights that compensation must be paid"); *Collopy v. Wildlife Comm'n, Dep't of Nat. Res.*, 625 P.2d 994, 1001 (Colo. 1981) (suggesting that difference between violation of just compensation clause and valid exercise of the state's police power lies in degree of deprivation)*; see generally* Christopher D. Supino, *The Police Power and "Public Use": Balancing the Public Interest Against Private Rights Through Principled Constitutional Distinctions*, 110 W. Va. L. Rev. 711 (2008) (discussing Supreme Court's inability to articulate principled distinction between Public Use Clause and police power).  Nevertheless, the Court declines to dispense with the distinction for two reasons.

First, courts have continued to differentiate between an exercise of the police power and eminent domain in determining whether a compensable taking has occurred under the U.S. and Colorado constitutions.  *See, e.g.*, *AmeriSource*, 525 F.3d at 1153-54 (stating that, because seizure of property "to enforce criminal laws" was "clearly within the bounds of the police power," property was "not seized for public use within the meaning of the Fifth Amendment" (internal quotations omitted)); *Young v. Larimer Cty. Sheriff's Office*, 356 P.3d 939, 943 (Colo. App. 2014) (citing *AmeriSource* and

holding that seizure of private property for use in criminal prosecution was within scope of city's police power and thus taking for public use did not occur).  By contrast, the *Steele* court's decision to dispense with the distinction was supported by a series of recent state court cases applying the just compensation requirement of the Texas Constitution.  *See Steele*, 603 S.W.2d at 789 (citing "[r]ecent decisions by this court . . . broadly appl[ying] the underlying rationale to takings by refusing to differentiate between an exercise of police power . . . and eminent domain").

Second, to the extent that the line between these two concepts is blurry, this case does not come close to that line.  Not only have courts held that the enforcement of criminal laws clearly falls within the scope of a state's police power, *see Kelley*, 611 N.W.2d at 481 ("Enforcement of the criminal laws is clearly within the county's power to provide for the health, safety and welfare of its citizens."), but defendants in this case were also responding to an emergency situation.

At least one court has held that police officers' destruction of a store in the course of apprehending an armed felony suspect falls within the "emergency exception" to the just compensation requirement.  *See Customer Co.*, 895 P.2d at 909.  As the court in *Customer Co.* noted, "[t]he emergency exception has had a long and consistent history in both state and federal courts" and represents a "specific application of the general rule that damage to, or even destruction of, property pursuant to a valid exercise of the police power often requires no compensation under the just compensation clause."  *Id.*; *see also Caltex*, 344 U.S. at 154 ("[T]he common law had long recognized that in times of imminent peril – such as when fire threatened a whole

21

community – the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved."). Courts have generally accepted the continued viability of the emergency exception under both state and federal constitutions, even as they disagree over the distinction between police power and eminent domain. *See, e.g.*, *Customer* Co., 895 P.2d at 934 (Baxter, J., dissenting) (disagreeing that property damage in case was noncompensable, but recognizing continued viability of emergency exception); *Steele*, 603 S.W.2d at 789, 792 (rejecting dichotomy between police power and eminent domain, but stating that defendant could "defend its actions [on remand] by proof of a great public necessity"). *But see Wegner*, 479 N.W.2d at 42 (declining to permit public necessity defense and stating that "better rule, in situations where an innocent third party's property is taken, damaged or destroyed by the police in the course of apprehending a suspect, is for the municipality to compensate the innocent party for the resulting damages").

The Court is persuaded by the California Supreme Court's reasoning in *Customer Co.* and finds that the undisputed facts in this case demonstrate that defendants' actions in apprehending Seacat fall within the scope of the emergency exception. Law enforcement officials were faced with an armed suspect who had unlawfully entered plaintiffs' home and barricaded himself inside. Docket No. 47 at 6-7, ¶¶ 20, 22; Docket No. 67 at 9, ¶ 10. The ensuing nineteen-hour standoff was deemed a "high-risk, barricade suspect situation," Docket No. 47 at 4, 7, ¶¶ 11, 22, in which Seacat fired at GVPD officers on two occasions. *Id.* at 6, 10, ¶¶ 21, 36.[12] Finally, it is

---

[12]At least two courts have indicated that the emergency exception only applies "if the State demonstrates the existence of imminent danger and an actual emergency

undisputed that "[a]ll law enforcement actions were done to remove Seacat from the residence while making all efforts to preserve life." *Id.* at 11, ¶ 44.[13]

Defendants were acting in response to a tangible threat to the health and safety of the public and the tactical decisions that ultimately destroyed plaintiffs' home were made pursuant to the state's police powers and not the power of eminent domain. *See Customer Co.*, 895 P.2d at 909. Accordingly, the damaging of plaintiffs' home does not constitute a compensable taking under either the U.S. or Colorado constitutions.

---

giving rise to actual necessity, an inquiry that is fact-specific." *Brewer v. State*, 341 P.3d 1107, 1118 (Alaska\ 2014); *see also TrinCo Investment Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (reversing dismissal of complaint under Fed. R. Civ. P. 12(b)(6) on ground that "[i]t [was] impossible," based on allegations in complaint, "to determine whether the requisite imminent danger and actual emergency giving rise to the actual necessity of the Forest Service's burning of TrinCo's property was present to absolve the Government under the doctrine of necessity"). In this case, there is no dispute that Seacat's actions posed a threat to the public and that defendants' actions were taken in response to that threat. To the extent *Brewer* and *TrinCo* further suggest that defendants must show their response was reasonable, the Court finds that such an inquiry sounds in due process rather than takings. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540 (2005) (holding that whether a government action "substantially advances" a legitimate state interest is "an inquiry in the nature of a due process, not a takings, test"); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398,1409-10 (9th Cir. 1989) (looking to factors such as "the need for the governmental action in question, the relationship between the need and the action, the extent of harm inflicted, and whether the action was taken in good faith or for the purpose of causing harm" in determining whether defendants' actions in breaching dam and destroying lake violated plaintiffs' substantive due process rights), *overruled on other grounds by Armendariz v. Penman*, 75 F.3d 1311 (9th Cir. 1996).

[13]In their motion to strike, plaintiffs argue that the same fact, asserted on page 31 of defendants' motion for summary judgment, is unsupported by a reference to the record. *See* Docket No. 80 at 17, ¶ 36. But plaintiffs admitted this fact in their response to defendants' summary judgment motion. Docket No. 54 at 4, ¶ 44. Accordingly, it is undisputed for purposes of summary judgment. To the extent Plaintiffs' Motion to Strike Defendants' Evidence in Motions Practice [Docket No. 80] asserts additional arguments not already addressed in this Order, those arguments are immaterial to the Court's resolution of the parties' cross-motions for summary judgment. Those portions of plaintiffs' motion to strike are therefore denied as moot.

Summary judgment is therefore appropriate in favor of defendants on plaintiffs' takings claims.

### C.  Federal Due Process Claims

Plaintiffs claim that defendants violated their due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution by destroying their property without providing just compensation.  Docket No. 48 at 9-12.[14]

The Fourteenth Amendment of the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV.  This guarantee contains both procedural and substantive components. *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998).  Procedural due process generally requires that a state follow certain procedures before depriving an individual of a protected liberty or property interest.  *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of [procedural] due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  In contrast, substantive due process serves as a prohibition against arbitrary government action, regardless of the fairness of the procedures used.  *Cty. of Sacramento*, 523 U.S. at 840, 845.  Plaintiffs' complaint is unclear about whether they are asserting a violation of their procedural or substantive

---

[14]Although plaintiffs also assert they were deprived of their due process rights under the Fifth Amendment, *see* Docket No. 48 at 9, only the Fourteenth Amendment is applicable where, as here, the defendants are state actors.  *See Bartkus v. Illinois*, 359 U.S. 121, 124 (1959); *Lyle v. Dodd*, 857 F. Supp. 958, 966 (N.D. Ga. 1994) ("It is axiomatic that the Fifth Amendment due process clause applies only to the federal government, while the Fourteenth Amendment due process clause applies to the states.").

due process rights.  *See* Docket No. 4 at 9-10.  As discussed below, however, plaintiffs'

claim cannot survive summary judgment under either theory.

### 1.  Procedural Due Process

Plaintiffs contend that defendants violated their procedural due process rights by

"unilaterally determin[ing] . . . that taking of property was necessary and legal under the

circumstances" and failing to provide just compensation.  Docket No. 48 at 10.  They

further suggest that defendants lacked authority for their actions.  *Id.* at 11.  Both

arguments are unavailing.

First, although due process generally requires that an individual be given "an

opportunity for some kind of hearing prior to the deprivation of a significant property

interest," *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 19 (1978) (internal

quotations omitted), pre-deprivation due process is not required when a state is

confronted with an emergency situation.  *See Miller v. Campbell Cty.*, 945 F.2d 348,

353 (10th Cir. 1991) (citing *Hodel v. Virginia Surface Mining & Recl. Ass'n*, 452 U.S.

264, 299-300 (1981)); *Hodel*, 452 U.S. at 300 ("Protection of the health and safety of

the public is a paramount governmental interest which justifies summary administrative

action.").  Because the undisputed facts in this case demonstrate that defendants were

faced with an emergency situation, *see* Docket No. 47 at 4, 6-8, ¶¶ 11, 20, 22, 27,

plaintiffs were not entitled to a hearing or other kind of process prior to the damaging of

their home.  Plaintiffs do not challenge this conclusion.  *See* Docket No. 54 at 10;

Docket No. 63 at 7.  Instead, they contend that the only issue in this case is "post-taking

compensation."  Docket No. 54 at 10.  The meaning of this statement is unclear.

However, to the extent plaintiffs are asserting that they have been denied post-deprivation procedural due process, their claim is belied by the existence of this lawsuit. *See Miller*, 945 F.2d at 354 (holding that "the condemnation process (or a revival of plaintiffs' Just Compensation claim should condemnation prove to be inadequate) offer[ed] the plaintiffs a sufficient post-deprivation hearing to obtain just compensation for the loss of their property").[15]

Plaintiffs also assert that there was no "law, regulation, or ordinance authorizing [defendants] to take property." Docket No. 48 at 11. It is not clear what plaintiffs are arguing here. If they mean to contend that defendants lacked formal powers of eminent domain, the Court has already determined that this case involves an exercise of the state's police powers in an emergency situation, not eminent domain. Moreover, defendants are statutorily authorized to enforce criminal laws – a power which necessarily entails the authority to apprehend suspects. Under Colo. Rev. Stat. § 31-15-401(1)(a), municipalities have the power "[t]o regulate the police of the municipality, including employing certified peace officers to enforce all laws of the state of Colorado .

---

[15]Although plaintiffs argue that Colorado's inverse condemnation procedures are inadequate to compensate them for their loss, *see* Docket No. 83 at 7, they do not argue that the procedures available through the state and federal court systems are generally inadequate to satisfy due process requirements. The conclusion that plaintiffs' ability to pursue this lawsuit constitutes adequate post-deprivation due process is not altered by the fact that plaintiffs' claims may ultimately prove unsuccessful. *See Stanley v. McMillian*, 594 F. App'x 478, 480 (10th Cir. 2014) (unpublished) ("Plaintiff's speculation that the state court would likely dismiss his complaint for lack of exhaustion does not prove the state has failed to provide adequate procedural safeguards for his due process rights . . . ."); *see also Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*.").

. . , and pass and enforce all necessary police ordinances."  Additionally, § 2-5-40 of the

Greenwood Village Municipal Code provides that members of the Greenwood Village

Police Department "shall be the enforcement officers of the City and shall see that the

provisions of the ordinances of the City and the laws of the State are complied with."

Greenwood Village, Colo., Code § 2-5-40 (2011).  There is no contention that

defendants were not members of the Greenwood Village Police Department.

Accordingly, any assertion that defendants' actions were not authorized by any law,

regulation, or ordinance, *see* Docket No. 48 at 11, is without merit.

   In summary, the Court finds that plaintiffs have failed to demonstrate a

deprivation of their procedural due process rights.  Dismissal of this claim is therefore

appropriate.

### 2.  *Substantive Due Process*

   Plaintiffs also make a cursory reference to substantive due process.  *See* Docket

No. 48 at 9; Docket No. 63 at 7.  But plaintiffs do not appear to assert a violation of their

substantive due process rights separate from the claim that they were denied just

compensation.  *See* Docket No. 54 at 10 (stating that only issue in case is "post-taking

compensation").  As previously determined, plaintiffs are not entitled to just

compensation under the takings clauses of the U.S. and Colorado Constitutions, and

plaintiffs' ability to seek just compensation in both state and federal court satisfies the

requirements of post-deprivation procedural due process.

   To the extent plaintiffs intended to assert a separate substantive due process

claim based on defendants' actions during the incident, they have failed to demonstrate

a genuine issue for trial.  *See Concrete Works of Colo., Inc.*, 36 F.3d at 1518.  In their

motion for summary judgment, defendants note that "Plaintiffs do not specifically plead

how Defendants' actions violated their rights."  Docket No. 47 at 17.  Instead of

clarifying the nature of their claims, however, plaintiffs respond with the ambiguous

assertion that this case involves only "post-taking compensation."  Docket No. 54 at 10.

Moreover, although plaintiffs cite the standard that governs substantive due

process claims, *see* Docket No. 48 at 9, they do not cite any facts or case law to show

that defendants' actions were objectively unreasonable or shocking to the conscience.

*See generally Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472-73 (2015) (holding that

objective reasonableness standard governs whether force deliberately used on pre-trial

detainee violates Fourteenth Amendment due process); *Cty. of Sacramento v. Lewis*,

523 U.S. 833, 846 (1998) (noting that "cognizable level of executive abuse of power"

under Due Process Clause is "that which shocks the conscience").  Defendants

highlight this deficiency in their response to plaintiffs' motion for summary judgment,

asserting that plaintiffs have not "argue[d] that the decisions Varney made during the

Incident were unreasonable or not done to protect life and the public health, safety and

welfare."  *See* Docket No. 53 at 15-16.[16]  However, plaintiffs fail to remedy the issue in

their reply, claiming only that defendants did not address the "lack of . . . substantive

due process."  *See* Docket No. 63 at 7.

_____

[16]Defendants also highlight this deficiency in their opposition to plaintiffs' takings
claims.  *See, e.g.*, Docket No. 47 at 26; Docket No. 60 at 6.  Yet plaintiffs repeatedly
assert that the reasonableness of defendants' actions is immaterial.  *See* Docket No. 48
at 7 (stating that, while "ouster may well have been completely necessary for the safety
of the public," plaintiffs are still entitled to compensation), 8 (stating that the
"reasonableness or legitimacy of the police conduct" is not "the issue facing the Lechs").

Plaintiffs have not asserted a substantive due process claim based on the reasonableness of defendants' actions during the incident and thus have failed to demonstrate a genuine dispute of material fact to preclude summary judgment in defendants' favor.[17]

### D.  Remaining State Law Claims

Plaintiffs' five remaining claims arise under Colorado state law.  Although the Court may exercise supplemental jurisdiction over state law claims if there is a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) provides that a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  The Tenth Circuit has instructed that, "if federal claims are dismissed before trial, leaving only issues of state law," courts should "decline to exercise pendent jurisdiction . . . absent compelling reasons to the contrary."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229-30 (10th Cir. 2010) (brackets, internal citations, and internal quotation marks omitted).  This rule is consistent with "[n]otions of comity and federalism," which "demand that a state court try its own lawsuits."  *Id.* at 1230 (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).

---

[17]Because the Court resolved plaintiffs' takings and due process claims without relying on the testimony of plaintiffs' expert, Dan Corsentino, or defendants' experts, Phil Hanson, Chris George, and Ernie Ortiz, the Court need not determine whether the testimony of those experts would be admissible at trial.  Accordingly, Defendants' Motion to Preclude Plaintiff's Expert Dan Corsentino [Docket No. 44], Plaintiffs' Motion to Exclude Expert Testimony [Docket No. 45], and Plaintiffs' Motion to Strike Expert Testimony [Docket No. 77] are denied as moot.

Plaintiffs do not argue that the Court should retain jurisdiction over their state law claims if their federal claims are dismissed, and the Court does not find any compelling reason to do so.  Accordingly, plaintiffs' first, second, third, fourth, and seventh (to the extent it asserts a violation of due process under Article II, § 25 of the Colorado Constitution) claims for relief are remanded to the state court for further proceedings. *See Thompson v. City of Shawnee*, 464 F. App'x 720, 726 (10th Cir. 2012) (unpublished) (where all federal claims were dismissed after case was removed to federal court, "district court had discretion either to remand the [state claims] to the state court or to dismiss them").[18]

## IV. ATTORNEY'S FEES

Colo. Rev. Stat. § 24-10-110(5)(c) provides:

> In any action against a public employee in which exemplary damages are sought based on allegations that an act or omission of a public employee was willful and wanton, if the plaintiff does not substantially prevail on his claim that such act or omission was willful and wanton, the court shall award attorney fees against the plaintiff or the plaintiff's attorney or both and in favor of the public employee.

By its terms, this provision applies only to plaintiffs' state tort claims, which allege willful and wanton conduct on the part of defendants.  *See* Docket No. 4 at 6-7.  Because

---

[18]Because the Court declines to retain jurisdiction over plaintiffs' state law claims, it need not consider those portions of Defendants' Reply in Support of Their Motion and Brief for Summary Judgment [Docket No. 60] that plaintiffs contend raise new arguments.  *See* Docket No. 69 at 2.  Accordingly, Plaintiffs' Motion to Strike Portion of Defendants' Reply or in the Alternative, Permit Sur-Reply by Plaintiffs [Docket No. 69] is denied.  *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005).

those claims are being remanded to state court, defendants' request for attorney's fees is premature.[19]

## V.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendants' Motion and Brief in Support of Summary Judgment [Docket No. 47] is **GRANTED** in part and **DENIED** in part.  It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment [Docket No. 48] is **DENIED**.  It is further

**ORDERED** that plaintiffs' fifth and sixth claims for relief are dismissed with prejudice.  It is further

**ORDERED** that plaintiffs' seventh claim for relief is dismissed with prejudice insofar as it states a claim under the Fourteenth Amendment of the U.S. Constitution.  It is further

**ORDERED** that plaintiff's first, second, third, and fourth claims for relief are remanded to the District Court for Arapahoe County, Colorado, where the case was filed as case number 2016CV31378, for further proceedings.  It is further

**ORDERED** that plaintiff's seventh claim for relief is also remanded to the District Court for Arapahoe County, Colorado, insofar as it states a claim under Article II, § 25 of the Colorado Constitution.  It is further

**ORDERED** that defendants' request for attorney's fees is **DENIED**.  It is further

_____

[19]In light of this resolution, the Court need not determine whether plaintiffs' complaint seeks exemplary damages, a point which the parties dispute.  *See* Docket No. 47 at 35; Docket No. 54 at 29.

**ORDERED** that Defendants' Motion to Preclude Plaintiff's Expert Dan Corsentino [Docket No. 44], Plaintiffs' Motion to Exclude Expert Testimony [Docket No. 45], Plaintiffs' Motion to Strike Expert Testimony [Docket No. 77], and Plaintiffs' Motion to Strike Portion of Defendants' Reply or in the Alternative, Permit Sur-Reply by Plaintiffs [Docket No. 69] are **DENIED AS MOOT**.  It is further

**ORDERED** that all other pending motions, to the extent not addressed in this Order, are **DENIED AS MOOT**.  It is further

**ORDERED** that, within 14 days of the entry of this Order, defendants may have their costs by filing a Bill of Costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.

DATED January 8, 2018.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

32